UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Sandra L. Lamorey,                              :
    Plaintiff,                              :
                                           :
                                           :
    v.                                          :File No. 2:02-CV-329
                                           :
                                           :
Jo Anne B. Barnhart,                            :
Commissioner of Social Security,                :
    Defendant.                              :

## OPINION AND ORDER
(Papers 9 & 13)

The claimant brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits ("SSD"). The case is currently before the Court on the claimant's motion to reverse the Commissioner's decision and the Commissioner's motion to affirm the decision.

For the reasons set forth below, the Commissioner's motion to affirm is GRANTED and the claimant's motion to reverse is DENIED.

## Procedural History

The claimant began working for National Life Insurance Company in 1973 shortly after high school. (Tr. 68, 128). The claimant worked as a mail room clerk, a keypunch operator, and a program librarian in the technical section. (Tr. 68, 69). She worked full-time for National Life until 1993 when she underwent surgical carpal tunnel release to alleviate pain and numbness in her hands. (Tr. 183). Immediately prior to surgery, she had worked as a forms analyst for approximately seven years. (Tr. 68). After surgery, she returned to National Life where she attempted to perform a variety of jobs including answering phones, opening mail, and stuffing envelopes. (Tr. 70). She was last employed in February 1994. Id. She was insured for DIB through December 31, 1999. (Tr. 307).

The claimant applied for SSD on October 19, 1995, alleging that she had been disabled since February 1994 due to pain and general weakness in both hands. (Tr. 357). Following denials initially and upon reconsideration, a hearing was held before an Administrative Law Judge ("ALJ") on July 9, 1996. The claimant, accompanied by counsel, testified at the hearing.  Howard Steinberg, a vocational

expert ("VE"), also testified.  On October 16, 1996, the ALJ found the claimant was not disabled, and he denied benefits. The claimant requested review by the Appeals Council on October 6, 1997.  On June 16, 1998, the Appeals Council denied the claimant's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. On August 14, 1998, the claimant filed an appeal in this Court.  Her insured status for DIB expired on December 31, 1999.  The Court remanded the matter to the Commissioner for further consideration on January 7, 2000[1].

A new hearing was held on December 6, 2000.  The ALJ denied the application on February 9, 2001.  The Appeals Council affirmed the decision on November 5, 2002.  The claimant appealed again to this Court on December 21, 2002. The matter was remanded again to the Commissioner on April 16, 2003 for location or reconstruction of the transcript. The transcript was reconstructed, and the claim was returned to the Appeals Council on December 4, 2003.  The Commissioner filed her answer to the claimant's complaint on August 17, 2004.

---

[1]Familiarity is assumed with the Court's <u>Opinion and Order</u> remanding the matter to the Commissioner. (Tr. 357-375).

## Standard of Review

In reviewing the Commissioner's decision, the court must limit its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); see 42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Even if a court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it stands on substantial evidence and the proper legal principles have been applied. See 42 U.S.C. § 405(g).  The court may not substitute its judgment for that of the Commissioner.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## Discussion

In its previous Opinion and Order the Court concluded that

4

> [t]he ALJ's determination that the claimant's
> physical condition did not rise to the level of a
> disability is supported by substantial evidence,
> and therefore, this finding need not be
> reconsidered by the Commissioner. The case must be
> remanded to determine whether The claimant's
> combined impairments, physical as well as mental,
> rendered her disabled.

The Court remanded the matter because "[t]he claimant's mental health had been in question prior to the ALJ's findings and, given the diagnosis of major depression, the Appeals Council failed to consider the combination of her mental and physical impairments." (Tr. 374)

Upon remand the ALJ concluded that despite the additional evidence regarding the claimant's depression she had the RFC to return to her past relevant work as a receptionist.  Accordingly, he concluded that the combination of physical and mental impairments did not render her disabled.

<u>DISCUSSION</u>

The claimant raises two arguments in her request to reverse the decision of the Commissioner.  First, she contends that the ALJ's conclusion that her combination of physical and mental impairments did not render her disabled is not supported by substantial evidence.  In this regard, she contends that it was error for the ALJ to find that her

5

depression was not a significant impairment.  Second, she argues that the ALJ erred at step four of the sequential evaluation process by confusing her past relevant work as a receptionist with the job as a receptionist as it is usually performed in the national economy.

I.  Significant Mental Impairment

The reports in the record concerning the claimant's mental impairment came from Drs. Stoll, Kellogg, Kessler, and Brian Ward, who has a masters in social work.  Dr. Stoll, a psychiatrist, examined the claimant in 1993 and early 1994 when she was on worker's compensation leave from her work at National Life.  He found that her symptoms of stress were situational and not serious.  (Tr. 209).  He found no reason to restrict her activities due to stress or depression. (Tr. 247).  Dr. Kellogg has been the claimant's treating physician since 1996.  He treated her for pain in both arms associated with depression.  He prescribed Ambien and Prozac.  He then referred her to psychologist Roger Kessler.  (Tr. 284). In September 2000, Dr. Kellogg completed an assessment of the claimant's physical capacity. (Tr. 389).  He reported, *inter alia*, that she could lift less than five pounds, could walk for about 20-25 minutes

before her fingers would hurt, and needed to rest her arms on a pillow.  (Tr. 390).

Dr. Kessler was the claimant's treating psychologist from early 1997 through 2000 after her insured status expired.  In September 1997, he diagnosed her with major depressive disorder and pain disorder associated with psychological factors and a medical condition.  (Tr.284). He assigned her a GAF of 45[2].  He stated that she "is currently substantially disabled."  Dr. Kessler noted that he was seeing her bi-weekly.  Also, in September 1997 completed an assessment of her Ability to do Work-Related Functions.  (Tr. 280-83).  He rated her poor to fair in the ability to make occupational and performance adjustments. On August 29, 2000, Dr. Kessler who had continued to treat the claimant completed another functional capacity assessment.  He again noted that she continued to be depressed and had a fair to poor ability to adjust to a job as well as to remember and carry out detailed instructions

_____

[2]The GAF provides a means for a clinician to make a judgment regarding a person's psychological, social and occupational functioning on a hypothetical continuum of mental health-illness.  See Diagnostic and Statistical Manual of Mental Disorders, 4th ed., at pp. 30-32.  A GAF rating of 45 indicates a low level of functioning.

(Tr. 386-87).  Her ability to remember and carry out simple instructions was fair to good as was her ability to adjust personally and socially to work.  (Tr. 387).

On July 5, 2000, the claimant was seen by Brian Ward at the request of the state agency.  Ward noted that the claimant had a GAF of 60.  He deferred diagnosis and prognosis to the claimant's treating physician and psychologist.  However, Ward believed that she could maintain attention and concentration for extended periods and sustain an ordinary routine without special supervision only "some of the time."  (Tr. 383).

1.  Dr. Kessler's Opinion

A treating source's opinion on the nature and severity of a claimant's impairment is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527.  Treating sources are "physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions."  20 C.F.R. § 404.1527(a)(2).

To be given controlling weight, the opinion of a treating physician "need not be supported directly by all of the other evidence . . . as long as there is no other substantial medical evidence that contradicts or conflicts with the opinion."  SSR 96-2p.  Whether the opinion is inconsistent with other medical evidence "is a judgment that adjudicators must make in each case."  Id.  When the opinion of a treating source is not entitled to controlling weight, it need not be disregarded entirely.  Id.  Rather, the opinion is still entitled to deference, and "must be weighed using all the factors provided in 20 C.F.R. 404.1527 and 416.927."  Id.  These factors include whether the source is an examining or treating source, the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the other medical evidence.  20 C.F.R. § 404.1527.

A treating source is the claimant's own physician, psychologist or other acceptable medical source who provides, or has provided, the claimant with medical treatment or evaluation, and who has, or has had, an ongoing

treatment relationship with the claimant.  20 C.F.R. §
404.1502.

> Generally, we will consider that you have an
> ongoing treatment relationship with an acceptable
> medical source when the medical evidence
> establishes that you see, or have seen, the source
> with a frequency consistent with accepted medical
> practice for the type of treatment and/or
> evaluation required for your medical condition.

Id.  If a medical source has examined the claimant but is
not a treating source, the weight given to that source's
opinion should be determined according to the factors in 20
C.F.R. §§ 404.1527 and 416.927.  The opinion of a treating
source is generally given more weight than the opinion of an
examining, non-treating source, and the opinion of an
examining source is generally given more weight than the
opinion of a non-examining source.  Echevarria v. Apfel,
1999 U.S. Dist. LEXIS 5545 at *20 (S.D.N.Y. 1999).

The ALJ stated that he declined to give controlling
weight to the conclusion in Dr. Kessler's 1997 report that
the claimant had "poor or no ability" to function in work-
related activities because:

> this report appears to have been completed by him
> in [sic] at the request of the claimant's counsel.
> He has provided no clinical records to support his
> assessment.  He completed a similar report in
> August 2000, but this was done 8 months after the
> claimant was last insured for benefits.  Further,

he again failed to provide any clinical records to
support these assertions.  The claimant was
evaluated by Mr. Ward in July 2000, and he noted
that she maintained a GAF of 60.  While the
claimant reported she was in counseling with Dr.
Kessler, she also failed to provide any clinical
records from this source.  (Exhibit 50).  Finally,
the undersigned has considered the claimant's
subjective assertions of disabling depression,
accompanied by chronic pain.  However, as noted in
the earlier decision of October 16, 1996, the
claimant is not accepted as a credible witness in
light of the lack of clinical findings to support
her assertions.  Further, the claimant remains
quite active.  She volunteers for a school lunch
program daily and she testified to traveling to
Florida every year for a 6-week holiday.  She also
sings in a church choir and is able to attend
rehearsals for this activity.

(Tr. 306).

A review of the record reveals that the ALJ misstated the

record on two matters: the absence of clinical notes from

Dr. Kessler and the claimant's daily activities.  First, the

record before the ALJ did contain at least one clinical

report from Dr. Kessler.  (Tr. 285).  In that September 1997

report Dr. Kessler found that the claimant had a major

depressive disorder.  This diagnosis and the resulting

prognosis was consistent throughout his more than three

years of treatment.  Moreover, the claimant testified at the

second hearing before the ALJ that she saw Dr. Kessler

regularly since 1997.  (Tr. 324-25).  The record before the

Appeals Council also contains two clinical reports from Dr. Kessler.  However, as the Appeals Council noted, the treatment notes dated November 18, 1999 and December 28, 1999 do not support disabling depression.  (Tr. 291).  On November 18, 1999, Dr. Kessler noted that he had not seen the claimant for more than one year.  She came to see him about issues arising from her recent divorce.  On December 28, 1999, she saw Dr. Kessler on her way to Florida for her annual vacation.  He told her to go to Florida and see him upon her return.

It was not error for the ALJ to fail to give controlling weight to Dr. Kessler's opinion.  Although Dr. Kessler stated in 1997 and again in 2000 (after the expiration of the claimant's insured status) that she was severely limited due to depression, the notes submitted to the Appeals Council contradict the conclusion of severe limiting depression.  Furthermore, even the notes submitted by the claimant's counsel to this Court fail to demonstrate severe disabling depression.  The central issue relating to depression was the divorce.  There is no indication that this was more than a situational problem.

Second, the ALJ stated that he did not accept the

12

claimant as a credible witness because in addition to the lack of clinical findings mentioned earlier, she remained "quite active" by volunteering daily at a school lunch program, rehearsing and singing in a church choir, and traveling to Florida each year for a "6-week holiday." (Tr. 306). While the record supports the finding that the claimant volunteered at the school no more than three days a week (Tr. 325, 440), not daily as the ALJ found (Tr. 306), this is certainly evidence that she can get out of the house and socialize. In addition, she testified that she usually goes down to Florida in the winter to visit relatives and get away from the cold. (Tr. 337).

The ALJ may consider a claimant's daily activities in determining her credibility and her ability to perform work-related activities. 20 C.F.R. ¶ 404.1529(c)(3)(I). The ALJ has the authority to question the claimant's assertion that severe depression limits her ability to work when the record reflects weekly attendance at church and choir practice as well as regular monitoring of school children. The ALJ was also entitled to discount the claimant's credibility when she has the ability to spend a good part of the winter each year in Florida with her mother and other relatives. While

the ability to travel does not necessarily translate into an active lifestyle, the circumstances of spending substantial time in Florida visiting family and escaping the cold were sufficient to discount the claimant's credibility.

In addition to the September 2000 assessment by Dr. Kessler and the report from Mr. Ward, the only additional medical records relating to the claimant's depression are statements made in passing by physicians who treated her for arm and hand pain. (Tr. 424-432).  Generally, the examiners continued her pain medication and recommended increased activity and physical therapy.  She indicated that she was not interested in medication for her depression. (Tr. 435). The examiners spent time counseling her and noted that she was seeing Dr. Kessler.  (Tr. 442).

The ALJ found that the claimant's depression did not significantly limit her ability to do work-related activities.  Based upon the claimant's activities and the reports of Dr. Kessler and Mr. Ward, the conclusion of the ALJ was supported by substantial evidence.

2. Ability to Return to Work as a Receptionist

The ALJ found that the claimant had the residual functional capacity to perform work

14

> where there is not a great deal of lifting and
> carrying of objects, and by that I would set 10
> pounds as the maximum that the individual would
> lift or carry, but not certainly on a routine or a
> repetitive basis, and in terms of using the hands
> primarily, both the right and the left hands, if
> we're looking at someone who is best suited for
> work in a job where there is not frequent or
> repetitive, or rapid use and movement of the hands
> in the work functions, where that function would
> be one of the primary functions of the job.  And
> in terms of doing work, if we're looking at
> someone who is best suited to work in an
> environment where they were not exposed to a great
> deal of, of stress, and by that I would quantify
> that to mean jobs where, where they actually had
> to work on an assembly line process, or where they
> had to wait on customers, such as in a fast food
> restaurant on a repetitive or a frequent basis.

(Tr. 342-43).   The VE noted that the Dictionary of

Occupational Titles (DOT) classified the receptionist job as

requiring the frequent use of the upper extremities, and,

therefore, the claimant would be precluded from that work.

(Tr. 343).  However, he believed that there were sedentary

jobs that did not require frequent reaching and handling.

One such job was information clerk with the availability of

these jobs 1,040 in Vermont/New Hampshire and 72,300

nationwide. (Tr. 344).  The VE testified that there was some

overlap between the jobs of receptionist and information

clerk as described in the DOT.  Based on this testimony the

ALJ found that the claimant could return to her previous

15

work as a receptionist, and therefore she was not disabled.

The claimant argues that she carried her burden at step four of the sequential disability process by demonstrating that she could not return to her past relevant work for two reasons.  First, she contends that because the VE testified that she lacked the RFC to perform the duties of a receptionist as defined in the DOT, she demonstrated that she could not return to that work as it is usually performed.  Second, she maintains that because there is no evidence that the physical requirements of the job as she actually performed it differed from the DOT definition, she demonstrated that she could not return to that particular job.  The Court agrees that the claimant met her burden at step four.

At step four the claimant has the burden of showing "an inability to return to her previous specific job *and* an inability to perform her past relevant work generally." Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) citing Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981) and SSR 82-62, 1982 WL 31386, at *3 (italics in original).  A VE may be called to explain the requirements of specific jobs, while the DOT is used to describe the requirements of jobs

as they are generally performed.  <u>Id.</u>  "Whereas the
Dictionary describes jobs as they are generally performed,
an expert is often called upon to explain the requirements
of particular jobs, and as such, his deviations from the
Dictionary in such testimony do not actually conflict with
the Dictionary."  <u>Jasinski</u>, 341 F.3d 185.

At the second hearing the ALJ asked the VE to describe
the job of receptionist as the claimant performed it.  The
claimant had testified at the first hearing that as a
receptionist she was required to answer the phone.  (Tr.
70).  She also stated that she did not continue in that job
because she had a hard time sitting and concentrating and
her arms bothered her. (<u>Id.</u>)   The VE classified that job as
semi-skilled and sedentary.  (Tr. 341).  The ALJ then
continued:

> Q. Well let me go back to one of the primary
> questions.  With regard to the job as she
> performed it, you had described this job as a
> semiskilled sedentary type of job, do you feel the
> job as she performed it was one that required
> frequent use of the hands, or more than, more than
> half of the time?
> A.  Well I would like to hear more testimony about
> it.  From what I could see in the, in the
> disability – – well actually I would like to, if
> we could put that question – –
> A. Okay, now just to, to recite what you were
> sent, you were sent a portion of the record to
> look, to review, which is part of a disability

report that was generated by our claimant where
she described the kinds of things that she did in
her previous jobs, is that correct?
A. That's correct.
Q. Do you have some conflict with the description
that you see there in [sic] of the job as
receptionist?
A. No.
Q. As it is generally performed, or do you feel
that that conflicts with the way that the DOT
number that you've given the job would - - let me
just turn to - -
A. In part, Your Honor, I base my opinion on my
experience that with people who develop - - say an
overuse syndrome, or an upper extremity impairment
as a result of key boarding, and then are given
the opportunity to go into a modified position say
as a receptionist, by definition the use of the
upper extremities is minimized in order to
accommodate the impairment, if you will.

(Tr. 346-47). While the DOT classifies the job of

receptionist as generally performed as requiring frequent

use (up to two-thirds of the workday) of the upper

extremities, (Tr. 343-44), "[m]any specific jobs differ from

those jobs as they are generally performed, and the expert

may identify those unique aspects without contradicting the

Dictionary." Id. The VE testified that the claimant could

not perform the job as receptionist under the DOT definition

because it required the frequent use of the upper

extremities. When asked if she had the ability to return to

her past job as a receptionist, he explained that he needed

more information about how the claimant actually performed

18

the job.  However, he never received this information, and the rest of the inquiry is confusing about whether or not the VE had enough information about how the claimant performed the job.  Based on the claimant's limitations, the VE found that there were receptionist jobs which could accommodate this restriction.  However, the VE never testified that the claimant could return to her job as she performed it because he was not given the opportunity to explore this issue.  When the VE added the new job of information clerk into the mix, this took the analysis to the fifth step where the burden shifts to the Commissioner. Since the DOT states that the claimant could not perform the receptionist job as it is generally performed and the VE never received enough information to determine the requirements of the job as the claimant performed it, the ALJ's decision that she could return to her past relevant work as a receptionist is not supported by substantial evidence.  This required the ALJ to proceed to the fifth step to determine whether there were other jobs in the national economy that the claimant could perform.

Disposition

When the Commissioner has committed error by not reaching the fifth step of the sequential evaluation process, the court generally should remand the matter for further consideration unless the record demonstrates that "no purpose would be served by a remand." Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998) quoting Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 644 (2d Cir. 1983). However, a remand for the award of benefits is appropriate when the record is clear that the claimant is disabled. See Shaw v. Chater, 221 F.3d 126, 135 (2d Cir. 2000). When clear evidence of disability is not contained in the record, an award of benefits may be the proper disposition when the Commissioner has failed to meet her burden at the fifth step, the application has been pending for a inordinate time, and a remand would further delay the proceedings. See Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000). Relying on Curry, the claimant urges the Court to remand for an award of benefits because of the lengthy delay in resolving her claim.

At the time that her insured status expired in December 1999, the claimant was 52 years old and had a high school

20

education with a skilled and semi-skilled work history.
(Tr. 92, 108, 341).  Since the ALJ determined that she could
return to her former type of work, he did not decide if her
skills were transferable.  Under the proper application of
the Medical Vocational Guidelines ("Grid"), a determination
of whether a 52 year-old claimant with high school education
and skill and semi-skilled work history who is limited to
sedentary work is disabled depends on the transferability of
work skills.  If her skills are transferable, she is not
disabled.  20 C.F.R. ¶ 404, Subpt.· App.2, Rule 201.15.  If
her skills are not transferable, the Grid directs a finding
of disability.  Rule 201.14.

In this case the Commissioner has introduced evidence
in the record that the claimant's skill are transferable to
the job of information clerk.·

At the first hearing before the ALJ, VE Steinberg
testified that the skills the claimant had learned in her
previous work would be transferable to other jobs that would
not involve frequent or repetitive use of the hands.
(Tr.93).  He listed the jobs of order clerk, information
clerk, general office clerk, and security guard.  (Tr. 94).
VE Steinberg listed the number of sedentary jobs in Vermont

21

as between 100 and 500.[3]  (Tr. 94).  At the second hearing VE Phillips testified that the job of information clerk was very similar to reception work.  (Tr. 345).  Accordingly, the record establishes that the claimant has the skills that are transferable to the job of information clerk.

The decision of the Commissioner is affirmed.

Dated at Burlington, in the District of Vermont, this 25th day of April, 2005.


/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

---

[3] The Second Circuit has not yet spoken as to what constitutes a "significant number" of jobs at step five of the sequential evaluation process.  Several other Circuits have examined this issue and concluded that a significant number of jobs requires something between 174 and 1,350. See, e.g., Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988)(1,350); Barker v. Secretary of Health and Human Services, 882 F. 2d 1474, 1479 (9th Cir. 1989)(1,266); Trimiar v. Sullivan, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (850-1,000); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988)( 500 jobs); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987)(174); Nix v. Sullivan, 744 F.Supp. 855, 863 (N.D.Ind. 1990)(675), aff'd, 936 F.2d 575 (7th Cir.1991). The number of jobs listed by VE Steinberg is significant. Moreover, the existence of jobs in the national economy is reflected in the Grid rules. 20 C.F.R. ¶404, Subpt.· App.2, 200.00 (b).